**United States District Court**
For the Northern District of California

1
2
3
4
5          UNITED STATES DISTRICT COURT
6          NORTHERN DISTRICT OF CALIFORNIA
7
8    MARKEE D. CARTER,                          No. C-13-4373 EMC (pr)
9              Plaintiff,
                                                **ORDER GRANTING IN PART AND**
10        v.                                    **DENYING IN PART DEFENDANTS'**
                                                **MOTION FOR SUMMARY JUDGMENT**
11   BRAD SMITH; *et al.*,
12             Defendants.
     _____/
13
14

## I.    INTRODUCTION

This *pro se* prisoner's civil rights action is now before the Court for consideration of a
defense motion for summary judgment.  For the reasons discussed below, the motion will be granted
in part and denied in part.  Specifically, the motion for summary judgment will be granted in all
respects except that it will denied as to the claim that Mr. Dobie was deliberately indifferent to a risk
to Mr. Carter's health posed by asbestos and will be denied on the qualified immunity defense for
Mr. Dobie regarding the asbestos exposure.  This and five other related cases will be sent to a
magistrate judge for settlement proceedings.

## II.    BACKGROUND

A.    Procedural History

The complaint alleged that defendants required Markee Carter to clean and work in an area
containing lead paint and asbestos in May and early June 2012.  The complaint also alleged that
defendants Philip Earley and Gary Loredo "fail[ed] to disclose/enter onto the Worker's

United States District Court

For the Northern District of California

1  Compensation form exposure to asbestos," and that failure "resulted in a 'fraudulent and/or

2  Incomplete Worker's Compensation claim.'"  Docket # 1 at 4.

3       This action was originally assigned to Magistrate Judge Grewal, who conducted the initial

4  review of the complaint under 28 U.S.C. § 1915A, found cognizable Eighth Amendment claims,

5  dismissed some defendants, and ordered service of process on defendants Philip Earley, Gary

6  Loredo and Joe Dobie.  *See* Docket # 6.

7       The action was later reassigned to the undersigned upon a determination that this action and

8  four other actions were related to the low-numbered action of *Terry v. Smith*, No. C 13-1227 EMC.

9  *See* Docket # 28.  All six actions asserted claims based on the alleged asbestos and lead paint

10  exposure during the cleaning of the mattress factory at San Quentin State Prison in May and early

11  June 2012.

12  B.    <u>Statement of Facts</u>

13       The following facts are undisputed unless otherwise noted.

14       The events and omissions giving rise to this action occurred in May and early June 2012

15  ("the relevant time").  Mr. Carter presents evidence that the cleaning work began on May 9.[1]  The

16  parties agree that the work stopped on June 6.  *See* Docket # 1 at 3; Docket # 33-2 at 61; Docket #

17  41-2 at 2 (worker's compensation form signed by G. Loredo and P. Earley states: "From 5/9/2012 to

18  6/6/2012, inmate Carter was sanding, scraping, or pressure washing lead based paint off the wall in

19  the mattress factory").

20       At the relevant time, Mr. Carter was a prisoner at San Quentin State Prison and worked in the

21  California Prison Industries Authority ("CALPIA") mattress and bedding factory at San Quentin

22  (the "mattress factory").  Defendants worked for CALPIA.  Joe Dobie was the supervisor of the

23  mattress factory.  Philip Earley was initially the factory manager of the mattress factory, and then

24  was assigned temporarily to Folsom State Prison.  Gary Loredo was the superintendent for several

25

26  ─────────────────────

27      [1] The parties disagree as to whether the cleaning work, including paint scraping, began on
May 9 (as Mr. Carter contends) or May 23 or May 29 (as defendants contend).  On a motion for
28  summary judgment, the Court is required to view the evidence in the light most favorable to the non-
movant, Mr. Carter.  The Court assumes the cleaning work started on May 9.

United States District Court

For the Northern District of California

CALPIA factories, and also was the acting factory manager of the mattress factory while Mr. Earley was at Folsom.

        1.    <u>The Cleaning of the Mattress Factory</u>

In May to June each year, CALPIA factories throughout California cease production as they prepare to take annual inventory at the end of the fiscal year.  When the factories cease production, inmate-workers clean the work areas.  Cleaning operations may include dusting, moving furniture, stripping the floor, and repainting the lines on the floor of the factory.   Every few years, the cleaning process also includes repainting the factory walls, which requires removing the dust from the walls to be painted.  Approximately 47 inmates were on the crew that cleaned the mattress factory in 2012.  *See* Docket # 39 at 2-3.

In May 2012, Mr. Griffin, the superintendent of the mattress factory, informed Mr. Earley that he intended to have the factory walls painted.  Mr. Earley approved the decision.  Mr. Griffin ordered paint and coordinated with Jeremy Young to have the walls painted in conjunction with the cleaning of the mattress factory.  Mr. Dobie assisted with the cleaning and painting preparations.

On May 23, Mr. Earley appointed Mr. Dobie to oversee the mattress factory through inventory.  Docket # 33-7 at 2.

On May 23 or 24, Mr. Dobie held a meeting with the inmates, and explained that they would be cleaning and painting the mattress factory for the next two weeks.  *See* Docket # 41-3 at 1.  (Defendants present evidence that the event occurred on May 29.  Docket # 33-7 at 2)   Mr. Dobie explained that the plan was to remove the paint from the bottom section of windows and areas on the walls where paint was peeling and blistering, and that portions of the floor would be repainted.  He told the inmates to check out putty knives, scrapers and wire brushes from the tool room to remove paint from the windows and walls. Inmates also used a compressed air hose to remove cotton dust that had collected on the walls and surfaces around the mattress factory to prepare for painting.

The inmates, including Mr. Carter, cleaned the mattress factory on May 23 (a Wednesday) and May 24 (a Thursday).  The inmates stopped for their regular day off (a Friday) and the Memorial Day holiday weekend.  The inmates returned to work on May 29 (a Tuesday) and worked Monday-Thursday until June 6.

**United States District Court**
For the Northern District of California

The parties disagree as to the circumstances under which the inmates received masks. According to Mr. Carter, he was issued an N95 mask and gloves about a week and a half after he started cleaning on May 9.  Docket # 33-2 at 48, 62, 63.  Mr. Carter stated at his deposition that the masks were provided by Mr. Dobie after Mr. Carter or another inmate in the group asked for protective gear when the pressure washer was being used.  *See* Docket # 33-2 at 63-64.[2]  A manufacturer's brochure for an N95 mask states: "Do not use for gases and vapors, oil aerosols, asbestos, arsenic, cadmium, lead," and certain other substances.  Docket # 53-1 at 36.

The parties disagree about the use of the power washer.  Mr. Carter presents evidence that the power washer was in use for about ten days before the factory was shut on June 6 and inmates using the power washer disturbed asbestos wrapping that was on the ceiling pipes.  According to Mr. Carter, when the inmates washed the ceiling and pipes, the pipe "insulation broke free upon contact with the hot water washer disbursing both wet and dry particles throughout" the factory onto the inmates, including Mr. Carter.  Docket # 39 at 2.  The water from the power washer and the floor-stripping solvents combined in "large pools on the floor," and mixed with the paint chips.  *Id.*  Inmates "waded through" and "inhaled" the materials "for approximately ten days."  Docket # 39 at 2.[3]

---

[2]  In contrast, defendants present evidence that boxes of particulate face masks, head coverings and latex gloves were set out in the work areas for inmates to use during the relevant time. Docket # 33-7 at 4.  Mr. Dobie declares that, on May 31, he instructed inmates scraping paint to wear particulate masks after he observed that inmates scraping paint from the wall area below the windows caused paint chips to fall down onto other inmates.  The inmates had difficulty removing some of the paint from the walls and windows and the use of the compressed air hose was creating an unclean working environment so Mr. Dobie stopped the use of the compressed air hose.  *Id.*

[3]  Contrary to Mr. Carter's evidence, Defendants' evidence suggests that the power washer was used only for 2-3 days and was not used as instructed by Mr. Dobie.  Defendants present evidence that Mr. Dobie made arrangements for Mr. Young to obtain a water power washer so the inmates could try to "power-wash[] the dust from the walls and surfaces while also attempting to remove paint from the windows."  Docket # 33-7 at 4.  Mr. Dobie states that he took a group of workers to another building for another chore on June 4, and told Mr. Young to have the inmates power wash the walls and windows in the mattress factory while he was gone to rid the surfaces of the cotton dust.  Docket # 33-7 at 4.  Mr. Dobie further states that he returned later that day and unexpectedly found puddles of water on the floor and water on the factory ceiling.  *Id.*  Mr. Dobie "had not ordered the inmates to power-wash the ceiling, and [he] would not have done so because there were exposed electrical wiring and fixtures in the area and the standing puddles of water on the floor posed another hazard."  *Id.*  Mr. Dobie states that he was away from the prison on June 5 and June 6, and learned upon his return that the factory had been shut down.

In a memo dated June 7, Jeremy Young (whose job title was "industrial supervisor, mattress & bedding"), wrote that, on June 4, he received instructions from his "immediate superior, Joe Dobie" to "pressure wash from ceiling to floor" and to cover the electrical boxes and junctions so that no water would interfere with the electrical wires or connections.  Docket # 53 at 26-27.  Mr. Young further stated in the memo that he "frequently checked in with [his] superior" – apparently referring to Joe Dobie – "to make sure we were proceeding according to his plans.  Joe Dobie stated multiple times throughout the day that I had to make sure that Inmates have N95 dust mask on.  He emphatically stated, in regards to the rationale for the dust masks; 'There could be lead in the paint that they are scraping off of the walls and windows.'"  *Id.*  According to Mr. Young's memo, Mr. Dobie told him before the end of the day to continue with the same procedures the next day, i.e., scrape the paint off the walls and windows.  *Id.*  That same memorandum noted that, on June 5, the inmates' "workload consisted of scraping, sanding, and pressure washing walls and floor."  *Id.*

On the morning of June 6, Luu Rogers, who worked in the CALPIA maintenance division, walked through the mattress factory and observed that paint had been removed from the factory walls and windows, and that the ceiling had been pressure-washed, including the asbestos wrapping on the overhead steam pipes.  Docket # 53 at 29.  Mr. Rogers contacted Mr. Loredo and advised him of the potential lead and asbestos hazard in the building.  Cleaning and painting operations were immediately halted on the morning of June 6.

There is a disagreement between the parties as to how many days the power washer was in use.  Mr. Carter presents evidence that it started on May 23.  Using that as the starting date, and taking into account that May 28 was the Memorial Day holiday and Mr. Carter's statement that the inmates had a Monday-Thursday work week, the power washing went on for eight days:  May 23 (Wednesday), May 24 (Thursday), May 29 (Tuesday), May 30 (Wednesday), May 31 (Thursday), June 4 (Monday), June 5 (Tuesday), and the morning of June 6 (Wednesday).

2.    Post-Shutdown Testing And Remediation At The Mattress Factory

CALPIA commissioned Earthshine Consulting, Inc., an environmental hazard company, to test for lead and asbestos.  Docket # 33-3 at 2; Docket # 33-4.  On June 8, 2012, Earthshine collected

United States District Court

For the Northern District of California

1   samples from floor debris in four locations in the factory to conduct a preliminary test for the

2   presence of lead and asbestos.  Docket # 33-4 at 2.  No asbestos was detected in those samples.

3   Docket # 33-4 at 3.

4          On June 27, 2012, Earthshine took additional samples from around the mattress factory.

5   Docket # 33-3 at 3; Docket # 33-4 at 6-19.   Those samples showed asbestos in the mastic adhesive

6   under the floor tiles in the factory supervisors' office and trace amounts of asbestos in the glazing

7   putty around the office windows, but it is undisputed that no inmates did paint scraping in the office.

8    Both materials were noted to be in "good" condition.  Docket # 33-3 at 3; Docket # 33-4 at 10.

9   Earthshine noted that the steam pipes along the factory ceiling were not tested but the pipe wrapping

10  was assumed to contain asbestos and was in "good" condition.  Docket # 33-4 at 10.  The report

11  does not mention whether the pipe wrapping had been damaged by the pressure wash as claimed by

12  Mr. Carter.  The report listed the asbestos in the mastic adhesive and glazing putty as nonfriable, and

13  listed the presumed asbestos in the pipe wrapping as friable.  Docket # 33-4 at 10.  According to

14  defendants, the lead detection samples taken showed that only the swing-out windows of the factory

15  had elevated lead levels.  *See* Docket # 33-3 at 3.  That, however, does not mean that there had not

16  been lead paint elsewhere, as the workers had been scraping the paint for many days before the

17  testing was done and the lead test results from the June 8 sampling of floor debris are not in the

18  record.

19         The mattress factory was cleaned by Performance Abatement Services beginning on July 5,

20  2012.  Following the cleaning and remediation, Performance Abatement Services confirmed that the

21  factory passed standards for lead presence.  The mattress factory resumed operations in Fall 2012.

22  *See* Docket # 33-3 at 14; Docket # 33-6 at 4.

23         3.     Defendants' Awareness Of The Risks

24         Mr. Carter presents evidence that prison officials generally were on notice of the presence of

25  asbestos in the prison.  He present a CALPIA "worksite orientation pamphlet" for "new

26  employee/CDCR staff/outside personnel" that had general workplace information, including this

27  caution about asbestos: "Asbestos covered pipes are located throughout the PIA complex.  DO NOT

28  DISTURB these pipes.  If you see a problem notify a supervisor."  Docket # 53-1 at 41-42.  The

pamphlet is undated, but there are markings indicating that it was in use in 2006, *id.* at 42, long

before the relevant time in this action.  Mr. Carter also presents a copy of a "San Quentin Warden's

Bulletin" regarding the "annual asbestos notification" that was directed to "all staff," and suggested

there was asbestos-containing material somewhere in the prison; however, the bulletin is dated

January 14, 2013, after the relevant time period.  *See* Docket # 41-1 at 67.

The parties disagree whether Mr. Dobie knew of the presence of lead and asbestos in the

mattress factory at the relevant time.  Mr. Carter presents a declaration made under penalty of

perjury from another plaintiff, Lynn Beyett, that he (Mr. Beyett) alerted Mr. Dobie to the presence

of lead paint and asbestos on May 23 or May 24:

> I went up to Joe Dobie and I said, "You do know all the paint on the
> windows and walls are "Lead Paint, and the pipes are wrapped in
> "Asbestos."??  He told me not to worry about it, he is running this
> shop & Lead Paint and Asbestos would not hurt anyone.  I said, "Mr.
> Dobie, I've been in the building trade for over Thirty (30) years, and
> we can't just scrap & chip or sand "Lead Paint", or power wash those
> pipes, as it will burst the Asbestos loose."
>
> I said, "There is Federal Laws that mandate we be trained and wear
> protective suits and have a breather at the very least.  Joe Dobie, then
> told me, "It's none of my business, I am the boss."  I then walked over
> to the maintenance shop to talk it over with our regular supervisor Mr.
> J. Young.  I told Mr. Young of the whole conversation I had with Joe
> Dobie, at which time Mr. Young said, "I know about it because I told
> Joe Dobie it's illegal and very wrong to make inmates work with no
> training on lead paint & asbestos removal, and no protective gear &
> Breather respirators.  I said, "Well what do we do?"  Mr. Young said,
> "Document everything or don't do it."  I said, He (Joe Dobie) told
> every one to either do what he says, or go home & refuse.  I can find
> replacements."  Mr. Young said, You have to do what Dobie says, or
> you will be fired most likely.  You know whatever Dobie says, it's the
> same as coming from the plant manager Phil Earley." . . .  Phil Earley
> had already told everyone, "You do what Dobie tells you to do.  It's
> the same as me telling you, because I have 600 men who want a job
> over in west block.  I will replace everyone of you if I have too."

Docket # 41-3 at 1 (errors in source); *see also* Docket # 33-2 at 42 (Mr. Earley stated that "'when

Joe Dobie tell you something, it's – it's like me – it's like me telling you this.'"); *id.* (Mr. Dobie told

the inmates "'you either do what I say or we'll get rid of you because there's plenty of new inmates

United States District Court

For the Northern District of California

just got here rather have your spot.'");[4] *but see* Docket # 33-2 at 54 (Carter deposition testimony indicating that volunteers were solicited to work and those who don't want to work don't have to take part in cleaning).[5]

There is no evidence that Mr. Earley or Mr. Loredo knew of asbestos or lead paint in the mattress factory. Mr. Carter presents evidence that they received training in many topics, but does not demonstrate that any of that training actually pertained to lead paint or asbestos detection. Mr. Earley states: "I was generally aware that some of San Quentin's facilities contained lead paint or asbestos, but I never received training concerning identification of those materials nor where they were located." Docket # 33-3 at 3. Mr. Loredo states that he was "aware that some of the steam pipes running along the walls and ceilings of the *furniture* factory were wrapped in asbestos material because the pipes were marked 'Asbestos.' But, I had no information concerning the presence of asbestos or lead paint in the mattress factory." Docket # 33-5 at 2 (emphasis added). Mr. Loredo also generally was aware that San Quentin executive staff issued notices regarding asbestos at the prison, but never received specific information concerning its presence in the mattress factory. *See id.* at 3.

4.    The Testing Of Inmates And Preparation Of Workers' Compensation Forms

After factory operations were halted on June 6, the inmates were tested for lead exposure. Mr. Carter's blood test came back with normal results. Docket # 33-2 at 6. His June 8, 2012 blood test report lists a normal reference range of "0.9-10.0 mcg/dL" (i.e., micrograms per deciliter) for

---

[4]  Mr. Dobie disputes that he knew of lead and asbestos. Mr. Dobie declares that he "was not aware of the presence of lead paint or asbestos in the factory building." Docket # 33-7 at 5. He states that he was aware that certain overhead pipes in the adjacent *furniture* factory were wrapped with asbestos material, and that similar pipes were in the *mattress* factory ceiling, approximately 30 feet off the ground, but he did not have information that the mattress factory pipes were wrapped with asbestos. *Id.* at 3 (emphasis added).

[5]  Defendants dispute that inmates were told they would be fired if they didn't do as they were told. Mr. Dobie declares that inmates "were given the option to take time off for a couple of weeks if they did not want to clean and paint." Docket # 33-7 at 2. He further declares that he told the inmates that, due to an excess supply of mattresses in stock and no current demand, he "did not know when they would return to work after inventory, and that there could be additional lay-offs due to a lack of work." *Id.*

1    lead in the blood, and lists Mr. Carter as being within range with a lead level of less than 2.0

2    mcg/Dl.  Docket # 33-2 at 8.

3         No test to measure asbestos exposure was done on Mr. Carter, and there is no evidence that

4    such a test exists.  *See* Docket # 32 at 10 (September 13, 2012 memorandum to Mr. Carter from the

5    California Correctional Health Care Services department denying his request for a test for asbestos

6    exposure; "[u]nfortunately, there is no 'testing' available for asbestos exposure in your

7    circumstances.  In general, if there are any effects arising from asbestos exposure they are very slow

8    to develop and may take decades to manifest to a degree to permit a test and diagnosis of the

9    condition.")

10        A worker's compensation fund claim dated June 7, 2012 was submitted by or for Mr. Carter.

11   *See* Docket # 1-1 at 23-24.  On the portion of the form where the claimant is to state the "specific

12   injury/illness and medical diagnosis if available," Mr. Carter and/or prison officials typed in

13   "possible lead exposure."  *Id.* at 23.  The form was signed by Mr. Carter as the employee and Mr.

14   Loredo as the employer representative.  *Id.* at 24.  Mr. Carter states that he did not fill out the form,

15   although he does not dispute that he signed it.  *See* Docket # 39 at 2.[6]

16        Mr. Carter did not file a claim with the California Victim Compensation & Government

17   Claims Board before filing this action.  *See* Docket # 33-2 at 66-68 (Lewis Decl., Ex. D).

18        Mr. Carter attributes several current health problems to his exposure to lead paint and

19   asbestos: eye problems, chest pains, coughing, headaches and sore bones.  *See* Docket # 1 at 4;

20   Docket # 33-2 at 43.  His medical records also show that he thinks his eye problems may be related

21   to the CPAP machine he uses nightly for sleep apnea.  *See* Docket # 33-2 at 20.  Mr. Carter offers

22   no competent evidence to prove a causal connection between any of his current health issues and

23   exposure to lead paint or asbestos.

24        According to several government authorities, "medical science has not established any

25   minimum level of exposure to asbestos fibers which is considered to be safe to individuals exposed

26   _____

27        [6] Defendants present evidence that none of the inmates Mr. Loredo assisted in filling out the
     worker's compensation forms claimed that they had been exposed to asbestos.  Defendants also
28   assert that an inmate-worker could have filed another worker's compensation form if he wanted to
     allege asbestos exposure.

United States District Court

For the Northern District of California

to the fibers." 20 U.S.C. § 3601(a)(3) (Congressional statement of findings and purposes for the Asbestos School Hazard Detection and Control Act of 1980); *id.* at § 4011(a)(3) (Congressional statement of findings and purpose for the Asbestos School Hazard Abatement Act of 1984); "Asbestos NESHAP Adequately Wet Guidance," Office of Air Quality Planning and Standards, U.S. Environmental Protection Agency, EPA340/1-90-019 (1990) at 1 ("no safe concentration of airborne asbestos has ever been established"). "[E]xposure to asbestos fibers has been identified over a long period of time and by reputable medical and scientific evidence as significantly increasing the incident of cancer and other severe or fatal diseases, such as asbestosis." 29 U.S.C. § 3601(a)(1) (Congressional statement of findings and purposes for the Asbestos School Hazard Detection and Control Act of 1980).

According to an EPA publication cited by defendants, wetting asbestos reduces the hazard of airborne asbestos. *See* Docket # 33 at 17 (citing "Asbestos NESHAP Adequately Wet Guidance").

### III.   VENUE AND JURISDICTION

Venue is proper in the Northern District of California because the events or omissions giving rise to the claims occurred at San Quentin State Prison in Marin County, which is located within the Northern District. *See* 28 U.S.C. §§ 84, 1391(b). The Court has federal question jurisdiction over this action brought under 42 U.S.C. § 1983. *See* 28 U.S.C. § 1331.

### IV.   LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment is proper where the pleadings, discovery and affidavits show that there is "no genuine dispute as to any material fact and [that] the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A court will grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A fact is material if it might affect the outcome of the lawsuit under governing law, and a dispute about such a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

United States District Court

For the Northern District of California

Generally, as is the situation with defendant's challenge to the Eighth Amendment claims, the moving party bears the initial burden of identifying those portions of the record which demonstrate the absence of a genuine dispute of material fact. The burden then shifts to the nonmoving party to "go beyond the pleadings, and by his own affidavits, or by the 'depositions, answers to interrogatories, or admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324.

Where, as is the situation with defendants' qualified immunity defense, the moving party bears the burden of proof at trial, he must come forward with evidence which would entitle him to a directed verdict if the evidence went uncontroverted at trial. *See Houghton v. South*, 965 F.2d 1532, 1536 (9th Cir. 1992). He must establish the absence of a genuine dispute of fact on each issue material to his affirmative defense. *Id.* at 1537; *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248. When the defendant-movant has come forward with this evidence, the burden shifts to the non-movant to set forth specific facts showing the existence of a genuine dispute of fact on the defense.

A verified complaint may be used as an opposing affidavit under Rule 56, as long as it is based on personal knowledge and sets forth specific facts admissible in evidence. *See Schroeder v. McDonald*, 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995) (treating plaintiff's verified complaint as opposing affidavit where, even though verification not in conformity with 28 U.S.C. § 1746, plaintiff stated under penalty of perjury that contents were true and correct, and allegations were not based purely on his belief but on his personal knowledge). Mr. Carter's complaint (i.e., Docket # 1 at 1-6) is made under penalty of perjury and is considered in opposition to the motion for summary judgment. The statement attached to the complaint as part of the exhibits (i.e., Docket # 1-1 at 3-10) is not made under penalty of perjury and therefore is not considered as evidence.

The court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting evidence with respect to a disputed material fact. *See T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). The evidence must be viewed in the light most favorable to the nonmoving party, and inferences to be drawn from the facts must be viewed in a light most favorable to the nonmoving party. *See id.* at 631.

<div style="text-align: left;">

1

<div style="text-align: center;">

**V.   <u>DISCUSSION</u>**

</div>

2   A.   <u>Motion For Summary Judgment</u>

3        1.   <u>Eighth Amendment Claim</u>

4        The Constitution does not mandate comfortable prisons, but neither does it permit inhumane

5   ones.  *See Farmer v. Brennan*, 511 U.S. 825, 832 (1994).  Deliberate indifference to an inmate's

6   health or safety may violate the Eighth Amendment's proscription against cruel and unusual

7   punishment.  *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).  A prison official violates the Eighth

8   Amendment only when two requirements are met: (1) the deprivation alleged is, objectively,

9   sufficiently serious, and (2) the official is, subjectively, deliberately indifferent to the inmate's

10   health or safety.  *See Farmer*, 511 U.S. at 834.

11        a.   <u>Asbestos</u>

12             i.   <u>Objective Prong</u>

13        Exposure to toxic substances may be a sufficiently serious condition to establish the first

14   prong of an Eighth Amendment claim, depending on the circumstances of such exposure, as

15   explained by the Supreme Court in *Helling v. McKinney*, 509 U.S. 25, 35 (1993) (inmate stated

16   Eighth Amendment claim based upon possible future harm to health, as well as present harm, arising

17   out of exposure to second-hand smoke).  The plaintiff "must show that he himself is being exposed

18   to unreasonably high levels" of the toxic substance.  *Helling*, 509 U.S. at 35.  Determining whether

19   the condition violates the Eighth Amendment "requires more than a scientific and statistical inquiry

20   into the seriousness of the potential harm and the likelihood that such injury to health will actually

21   be caused by exposure to [the toxic substance].  It also requires a court to assess whether society

22   considers the risk that the prisoner complains of to be so grave that it violates contemporary

23   standards of decency to expose *anyone* unwillingly to such a risk.  In other words, the prisoner must

24   show that the risk of which he complains is not one that today's society chooses to tolerate."

25   *Helling*, 509 U.S. at 36.

26        Although *Helling* was a second-hand smoke case, the rule also applies to asbestos exposure.

27   In *Wallis v. Baldwin*, 70 F.3d 1074 (9th Cir. 1995), the Ninth Circuit cited *Helling* in a case in which

28   an inmate had been exposed to asbestos during a prison cleaning operation.  The facts were much

</div>

<div style="text-align: left; writing-mode: vertical;">

**United States District Court**
For the Northern District of California

</div>

United States District Court

For the Northern District of California

1  stronger for the plaintiff in *Wallis* than in Mr. Carter's case, as the *Wallis* plaintiff extensively

2  handled asbestos-containing materials when he was on a work detail required to clean an attic with

3  damaged asbestos-containing insulation on pipes and insulation material that "had broken loose and

4  lay scattered around the attic" with other debris.  *Id.* at 1075.  Wearing inadequate masks, the

5  inmates were required to "tear off loose pipe covering and insulation" and bag it for disposal in a

6  dusty attic without outside ventilation.  *Id.*  The court in *Wallis* spent little time discussing whether

7  the objective prong was satisfied for the Eighth Amendment claim because it was "uncontroverted

8  that asbestos poses a serious risk to human health," and the plaintiff's medical expert had declared

9  that the amount of exposure for that plaintiff was "medically serious," *id.* at 1076.

10      Other circuits also have cited *Helling* in cases involving toxic substances such as asbestos.

11  *See, e.g., Templeton v. Anderson*, 2015 WL 1652143, *3 (10th Cir. 2015) (summary judgment

12  proper for defendant because requiring inmate to work for one hour removing asbestos mastic and

13  tiles "was not a significant duration given the type of exposure at issue" and therefore did not satisfy

14  the objective prong of Eighth Amendment claim); *Smith v. Howell*, 570 F. App'x 762, 765 (10th Cir.

15  2014) (affirming summary judgment on qualified immunity grounds on Eighth Amendment claim

16  because there were no Tenth Circuit or Supreme Court cases by 2003 that had held "that a limited

17  exposure to asbestos dust for a few hours poses such an objectively serious risk of future harm to

18  offend contemporary standards of decency.  Indeed there is no such authority even today."); *Herman*

19  *v. Holiday*, 238 F.3d 660, 665 (5th Cir. 2001) (there would be genuine issues of fact whether

20  plaintiff was exposed to levels of asbestos sufficient to pose an unreasonable risk of damage to his

21  future health, but summary judgment was proper for other reasons); *McNeil v. Lane*, 16 F.3d 123,

22  125 (7th Cir. 1993) (Eighth Amendment claim properly dismissed because being housed in a cell for

23  ten months near asbestos-covered pipes was not a serious enough condition; plaintiff "does not

24  allege facts sufficient to establish that he was exposed to unreasonably high levels of asbestos.  Had,

25  for example, [plaintiff] been forced to stay in a dormitory where friable asbestos filled the air, . . .we

26  might agree that he states a claim under the Eighth Amendment. . . .  That, however, is not this

27

28

United States District Court

For the Northern District of California

1  case. . . . [T]he fact remains that asbestos abounds in many public buildings.  Exposure to moderate

2  levels of asbestos is a common fact of contemporary life and cannot, under contemporary standards,

3  be considered cruel and unusual.")

4       Here, there are triable issues as to whether Mr. Carter was subjected to an objectively serious

5  condition involving asbestos during the cleaning of the mattress factory.  The parties agree that there

6  was asbestos present, but they disagree as to the danger, if any, posed by the asbestos.  Defendants

7  argue that the test results showed "minimal" asbestos material which they interpret to mean that

8  there was a "de minimis" risk to the workers.  Docket # 33 at 16.  Defendants also argue that the

9  length of the exposure "was not a sufficient period of time to develop any significant medical

10  condition."  *Id.*  However, Defendants' assertion that the amount of asbestos and amount of exposure

11  to it were simply too low to add up to an objectively serious condition are not sufficient to warrant

12  summary judgment in their favor when the evidence presented by Mr. Carter is considered.  A

13  genuine dispute exists as to whether the asbestos exposure posed a sufficiently serious condition

14  based on evidence that (a) inmates used a power washer to clean asbestos-wrapped pipes on the

15  ceiling; (b) the pipe insulation broke when power-washed and this caused both wet and dry particles

16  to be disbursed throughout the factory onto inmates, including Mr. Carter; (c) the inmates inhaled

17  the materials (including asbestos) for several days; (d) the mask provided to Mr. Carter was not

18  intended for use with asbestos; (e) there are government findings that medical science has not

19  established any minimum level of exposure to asbestos fibers which is considered to be a safe level

20  of exposure; and (f) there are government findings of long-term health risks from exposure to

21  asbestos fibers.

22       Defendants argue that the use of the pressure washer to clean the pipes "undermines the risk

23  of harm because wetting asbestos is the central component of the Environmental Protection

24  Agency's abatement procedure."  Docket # 33 at 17.  "Asbestos NESHAP Adequately Wet

25  Guidance," the EPA publication cited by defendants, supports the general proposition that wetting

26  asbestos is used to reduce the hazard, but has many qualifiers that defendants simply do not address,

27  such as the requirement that the asbestos must be made "adequately wet" to reduce the hazard.

28  Defendants offer no proof that the power washing of the pipes made the asbestos insulation

United States District Court

For the Northern District of California

1    "adequately wet."  Defendants may have established that wet asbestos is safer than dry airborne

2    asbestos, but that does not lead to an inevitable conclusion that the asbestos in the mattress factory

3    was sufficiently wet to eliminate any hazard.  Moreover, Mr. Carter presents evidence that would

4    support an inference that the asbestos was not sufficiently wet, as he declares that the use of the

5    power washer broke the insulation, "disbursing both wet *and dry particles* throughout" the factory

6    onto the workers.  Docket # 39 at 2 (emphasis added).

7       Defendants also point out that Mr. Carter was provided a particulate mask made available by

8    CALPIA staff.  Docket # 33 at 16.  However, Mr. Carter's evidence that the type of mask provided

9    was not suited for asbestos raises a triable issue as to whether the mask adequately addressed the

10    risk.  *Cf. Wallis*, 70 F.3d at 1075 (although inmate was given a face mask to wear while cleaning

11    asbestos in attic, "the mask's packaging expressly states that it is inadequate for use with asbestos").

12       In sum, while the facts are weaker than those in *Wallis*, the Court, viewing all the evidence

13    and reasonable inferences therefrom in Mr. Carter's favor, cannot conclude the *Helling* standard has

14    not been met as a matter of law.

15               ii.     <u>Subjective Prong</u>

16       The plaintiff must show that prison officials acted with deliberate indifference to the risk to

17    his health or safety to establish the second prong of an Eighth Amendment claim.  Under the

18    deliberate indifference standard, the prison official must not only "be aware of facts from which the

19    inference could be drawn that a substantial risk of serious harm exists," but "must also draw the

20    inference."  *Farmer*, 511 U.S. at 837.  The prisoner "need not show that a prison official acted or

21    failed to act believing that harm would befall an inmate; it is enough that the official acted or failed

22    to act despite his knowledge of a substantial risk of serious harm."  *Id.* at 842.  "Whether a prison

23    official had the requisite knowledge of a substantial risk is a question of fact subject to

24    demonstration in the usual ways, including inference from circumstantial evidence, . . . and a

25    factfinder may conclude that a prison official knew of a substantial risk from the very fact that the

26    risk was obvious."  *Id.* (citation omitted).

27       Mr. Earley and Mr. Loredo prevail on the subjective prong of the Eighth Amendment claim

28    with regard to the asbestos exposure. For Mr. Earley and Mr. Loredo, the only evidence regarding

their knowledge is that they generally were aware that asbestos existed at San Quentin, although they did not know the precise locations of the asbestos.  Mr. Loredo also knew some of the pipes in the *furniture* factory had asbestos wrapping, but did not know whether the mattress factory pipes also had asbestos wrapping.  More importantly, there is no evidence that Mr. Earley or Mr. Loredo knew that the mattress factory cleaning work would include power-washing the ceiling and pipes.  In light of the absence of evidence that these two defendants knew that there was asbestos wrapping on the pipes and the absence of evidence that these two defendants knew that the asbestos-wrapped pipes would be power-washed and subject to damage which allegedly released asbestos, no reasonable jury could conclude that these two defendants acted with deliberate indifference to a serious risk to Mr. Carter's health.

The analysis is different for Mr. Dobie, because Mr. Carter presents evidence that Mr. Dobie actually knew of the asbestos in the mattress factory and nonetheless required inmates to work in a manner that could and did disrupt that asbestos.  Viewing the evidence in the light most favorable to the nonmovant, a reasonable juror could find that Mr. Dobie knew of and disregarded the risk posed to Mr. Carter by the presence of asbestos based on the following facts: (a) Mr. Dobie was informed by inmate Beyett of lead paint and asbestos in the mattress factory and specifically about the damage of power washing asbestos wrapped pipes two weeks before the work was stopped; (b) Mr. Dobie was aware that the power washer was being used floor to ceiling as it occurred, according to Mr. Young's memorandum; (c) new employees were informed that asbestos-covered pipes were located throughout the PIA complex and were instructed not to disturb those pipes; and (d) all defendants knew there was at least some asbestos at San Quentin. *Cf. Wallis,* 70 F.3d at 1077 ("it is not enough for the prison officials to claim they did not know about the asbestos in the attics.  The existence of the asbestos assessment report, the fire marshal's order to clean the debris off the pipes, and the various prison officials' testimonies that they knew or suspected the existence of exposed asbestos created an obligation for the defendants to inspect the attics prior to sending work crews into them for forty-five hours – unprotected.")  Triable issues of fact exist regarding the subjective prong of Mr. Carter's Eighth Amendment claim against only Mr. Dobie as to the asbestos exposure.

United States District Court

For the Northern District of California

If a prison official is aware of a serious risk to an inmate, he could avoid "liability if [he] responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844. Summary judgment cannot be granted to Mr. Dobie on this basis because there are triable issues as to whether the N95 mask provided to Mr. Carter represented a reasonable response to the risk posed by the asbestos.

b.   Lead Paint

Mr. Carter has failed to establish, or show a genuine issue for trial, that the lead paint to which he was exposed presented a sufficiently serious condition to satisfy the first prong of an Eighth Amendment claim. He has presented evidence that some of the paint in the mattress factory contained lead, that he scraped and sanded paint during the mattress factory clean-up, and that the N95 mask made available to him was not intended for use with lead. However, the undisputed evidence is that his blood was tested for lead, and the blood test came back with a normal result. No evidence was presented that the amount of lead in a person's blood will increase after the lead exposure is terminated; in other words, there is no evidence that a person who has normal levels of lead in his blood after his exposure to the lead ends will later have abnormally elevated levels of lead in his blood. Given that the only objective measure of lead exposure came back showing normal results, no reasonable jury could conclude that the risk posed by the lead paint was "so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk." *Helling*, 509 U.S. at 36.

The causation requirement has been treated as part of the subjective prong of the Eighth Amendment analysis by the Ninth Circuit in *Jett v. Penner*, 439 F.3d 1091, 1097 (9th Cir. 2006) ("This second prong – defendant's response to the need was deliberately indifferent – is satisfied by showing (a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference").[7] However, causation "also comes into play as to the objective component" of a claim based on exposure to a toxic substance because the objective prong "allows a

---

[7] If there is an ongoing risk, the prisoner need not await until harm is caused to him before obtaining injunctive relief. *See Farmer*, 511 U.S. at 845. Here, there is not an ongoing problem from which the plaintiff seeks injunctive relief, but instead a past problem for which he seeks damages.

United States District Court

For the Northern District of California

1    court to consider, among other things, a 'scientific and statistical inquiry into the seriousness of the

2    potential harm and the likelihood that such injury to health will actually be caused by exposure to [a

3    substance].'" *Moore v. Faurquire*, 595 F. App'x 968, 973 n.6 (11th Cir. 2014). For example, in

4    *Moore*, the court found that a prisoner failed to raise a triable issue on the objective prong because

5    he presented no evidence that applying paint stripper while wearing inadequate protective gear for

6    one week created a substantial risk of serious harm: his "medical records contain no evidence that

7    such a limited exposure to the paint stripper was capable of causing" the health problems he

8    attributed to the exposure. *Id.* at 973. *See, e.g., Maus v. Murphy*, 29 F. App'x 365, 369 (7th Cir.

9    2002) (plaintiff "cannot prevail by demonstrating that the cell-front construction merely exposed

10   him to a risk of harm; instead he must show that the project actually caused him harm or was

11   reasonably certain to cause him future serious injury," but plaintiff had failed to "present evidence

12   connecting lung complications to any risks associate with exposure to lead paint"); *Mejia v.*

13   *McCann*, 2010 WL 5149273, *8-*9 (N. D. Ill. 2010) ("existence of lead paint on walls does not state

14   a viable constitutional claim," and there was no "competent evidence that lead paint in his cellhouse

15   has caused [plaintiff] injury").

16        Mr. Carter's self-diagnosis that his bones hurt due to the lead exposure is insufficient to

17   create a triable issue that the lead paint posed a sufficiently serious condition for the objective prong

18   of an Eighth Amendment claim. He has not shown any expertise in the diagnosis of medical

19   conditions. The claimed causal link is pure speculation in view of the normal blood test results,

20   and that is not enough to defeat the motion for summary judgment. *See, e.g.*, *Mejia v. McCann*,

21   2010 WL 5149273, *9-*10 (summary judgment granted for defendants on Eighth Amendment claim

22   based on the regional problem of radium in the water because plaintiff did not show it caused

23   plaintiff any harm, and his allegations that he suffered dry scalp and hair loss that he did not have

24   before incarceration was not sufficient to send the matter to trial).

25        The conclusion that Mr. Carter has not satisfied the objective prong for lead paint exposure is

26   not inconsistent with the conclusion that he has satisfied the objective prong for asbestos exposure.

27   Unlike asbestos, there are not Congressional findings that medical science has not established any

28   minimum level of exposure to lead which is considered to be safe. Most importantly, unlike

United States District Court

For the Northern District of California

asbestos, there *is* a test for lead exposure, and Mr. Carter had a normal test result. A reasonable jury could not ignore that the blood test showed no harm to Mr. Carter when deciding whether Mr. Carter had raised a triable issue on the objective prong of his Eighth Amendment claim. Given the limited duration of his exposure to lead and the normal blood test results, a reasonable jury could not find that he was exposed to a risk "so grave that it violates contemporary standards of decency to expose anyone unwillingly to such a risk." *Helling*, 509 U.S. at 36. Mr. Carter's claim falters on the objective prong of his Eighth Amendment claim based on his exposure to lead.

Mr. Carter's lead paint claim also fails on the subjective prong. Viewing the evidence in the light most favorable to Mr. Carter, no reasonable jury could find that defendants were deliberately indifferent to any risk posed by lead paint. Mr. Carter presents no evidence that Mr. Earley or Mr. Loredo was aware that there was lead paint in the factory or was aware that the inmates would be scraping lead paint in the factory cleaning operations. The undisputed evidence is that these two defendants did not know of the lead paint, and without an awareness of the risk, they cannot be said to have been deliberately indifferent to any risk posed by it. Finally, if as *Jett* suggests, causation is part of the subjective prong of the Eighth Amendment analysis, Mr. Carter's claim fails against all three defendants because there is a complete absence of evidence that their actions or inactions with regard to the lead paint caused him any harm.

To summarize the rulings on the Eighth Amendment claims: In order to avoid summary judgment, Mr. Carter had to establish or show a triable issue of fact as to the existence of both prongs of his Eighth Amendment claims. Viewing the evidence and reasonable inferences therefrom in the light most favorable to Mr. Carter, defendants Loredo and Earley are entitled to judgment in their favor on his Eighth Amendment claim based on his exposure to asbestos. Triable issues remain with regard to whether Mr. Dobie was deliberately indifferent to the risk posed by the asbestos. Viewing the evidence and reasonable inferences therefrom in the light most favorable to Mr. Carter, all defendants are entitled to judgment in their favor on his Eighth Amendment claim based on his exposure to lead.

United States District Court

For the Northern District of California

2.     Qualified Immunity

The defense of qualified immunity protects "government officials . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In *Saucier v. Katz*, 533 U.S. 194 (2001), the Supreme Court set forth a two-pronged test to determine whether qualified immunity exists.  First, the court asks:  "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?"  *Id.* at 201.  If no constitutional right was violated if the facts were as alleged, the inquiry ends and defendants prevail.  *See id.*  If, however, "a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established. . . .  'The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.' . . . The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."  *Id.* at 201-02 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).  Although *Saucier* required courts to address the questions in the particular sequence set out above, courts now have the discretion to decide which prong to address first, in light of the particular circumstances of each case.  *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

The existence of a triable issue as to whether a prison official was deliberately indifferent to an inmate's health or safety may require denial of a defense motion for summary judgment on the merits of the Eighth Amendment claim, but the qualified immunity analysis does not end there. *See Estate of Ford v. Ramirez-Palmer*, 301 F.3d 1043, 1045 (9th Cir. 2002); *see id.* at 1049 ("*Saucier's* key point is that the qualified immunity inquiry is separate from the constitutional inquiry").  "Even though the constitutional issue turns on the officers' state of mind (here, deliberate indifference to a substantial risk of serious harm), courts must still consider whether – assuming the facts in the injured party's favor – it would be clear to a reasonable officer that his conduct was unlawful."  *Estate of Ford*, 301 F.3d at 1045.  That is, the court must consider whether the

United States District Court

For the Northern District of California

information available to the defendants made it so clear that the plaintiff would be harmed that no reasonable officer could have allowed the situation to occur.  *Id.*

For an Eighth Amendment violation based on a condition of confinement (such as a safety risk), the official must *subjectively* have a sufficiently culpable state of mind, i.e., "'the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.' . . .  Thus, a reasonable prison official understanding that he cannot recklessly disregard a substantial risk of serious harm, could know all of the facts yet mistakenly, but reasonably, perceive that the exposure in any given situation was not that high.  In these circumstances, he would be entitled to qualified immunity." *Estate of Ford*, 301 F.3d at 1050 (quoting *Farmer v. Brennan*, 511 U.S. at 834, and citing *Saucier*, 533 U.S. at 205).  Although the general rule of deliberate indifference had been expressed in *Farmer*, no authorities had "fleshed out 'at what point a risk of inmate assault becomes sufficiently substantial for Eighth Amendment purposes.'" *Estate of Ford*, 301 F.3d at 1051 (quoting *Farmer*, 511 U.S. at 834 n.3).  Because it had not been fleshed out, "it would not be clear to a reasonable prison official when the risk of harm from double-celling psychiatric inmates with one another changes from being *a* risk of *some* harm to a *substantial* risk of *serious* harm.  *Farmer* left that an open issue.  This necessarily informs 'the dispositive question' of whether it would be clear to reasonable correctional officers that their conduct was unlawful in the circumstances that [they] confronted." *Estate of Ford*, 301 F.3d at 1051 (emphasis in original).  Each of the defendants in *Ford* was entitled to qualified immunity even though he was aware of some information that there was *some* risk in double-celling the violent inmate with the decedent or any other inmate.[8]  "*Ford's* central holding is that an officer

---

[8] In *Estate of Ford*, the inmate was killed in his cell by inmate Diesso two days after they began double-celling.  Even though one prison official knew a lot information demonstrating Diesso's extraordinary dangerousness in general, that same prison official would have been aware of some information suggesting that he was not currently a danger to a cellmate; under the circumstances, it could not be said that a reasonable officer in defendant's position would necessarily have perceived that continuing to designate Diesso as eligible for double-celling exposed any approved cellmate to an excessive risk of serious harm.  *Id.* at 1051.  A second prison official was entitled to qualified immunity for his decision to let Diesso and Ford share a cell because he had received some information suggesting the inmates were compatible (including that they had celled together before and requested to do so again) along with information about a recent attack on another inmate.  *See id.* at 1047, 1052.  Even though that second official failed to comply with prison regulations requiring him to look at the inmates' central files before making the housing decision,

United States District Court

For the Northern District of California

is entitled to qualified immunity when the transition from a risk of *some* harm to a *substantial* risk of *serious* harm would not have been clear to a reasonable prison official." *Castro v. County of Los Angeles*, 785 F.3d 336, 348 (9th Cir. 2015) (rejecting qualified immunity where jury already had found defendant to be deliberately indifferent for putting combative arrestee in the sobering cell with plaintiff who had been arrested for his own safety after being found drunk in public); *id.* at 348-49 (distinguishing *Ford* on the ground that prison officials had mixed information about the risk posed by the cellmate in *Ford*, whereas the *Castro* plaintiff had no history of compatibility with the arrestee who violently attacked him in the sobering cell).

Just as qualified immunity was allowed in *Estate of Ford* because of the undefined qualitative elements, qualified immunity is appropriate here because of the undefined qualitative elements in *Helling*. *Cf. A.D. v. California Highway Patrol*, 712 F.3d 446, 455 n.4 (9th Cir. 2013) (denying qualified immunity for a substantive due process claim; "[t]he standard for a due process violation – purpose to harm unrelated to a legitimate law enforcement objective – does not contain undefined qualitative elements ("substantial risk" and "serious harm") like the Eighth Amendment standard does."). *Helling* stated that whether exposure to "unreasonably high levels" of a toxic substance violates the Eighth Amendment "requires more than a scientific and statistical inquiry into the seriousness of the potential harm and the likelihood that such injury to health will actually be caused by exposure to [the toxic substance]. It also requires a court to assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk. In other words, the prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate." *Helling*, 509 U.S. at 36. This imprecise rule is the sort of rule that lower courts sometimes have to struggle with to determine its application to a given set of circumstances.

---

"he would not have uncovered evidence that would have made him aware of a substantial risk of serious harm." *Id.* at 1052. Finally, qualified immunity was appropriate for a third official who had reviewed Diesso's file recently and was aware of Diesso's history of violence and aggressive behavior but also was aware that Diesso and Ford were not gang-enemies, were not classified as predator and victim, had celled together before without problems, and had requested to cell together on this occasion. *Id.* at 1052-53.

United States District Court

For the Northern District of California

1    The cases mentioned earlier show that not all exposure to asbestos amounts to an objectively

2   serious conduct, and that no court has articulated an well-defined test that a reasonable prison

3   official could look to in order to determine the lawfulness of his actions.  On the one hand, *Wallis v.*

4   *Baldwin* found an Eighth Amendment violation for an inmate who directly handled already-damaged

5   asbestos containing materials in a confined space for about 45 hours.  On the other hand, courts have

6   rejected claims of Eighth Amendment violations from an inmate who worked for about an hour

7   removing asbestos mastic and tiles (*Templeton v. Anderson*), an inmate who was exposed to asbestos

8   dust for a few hours (*Smith v. Howell*), and an inmate who was housed for ten months near asbestos-

9   covered (but undisturbed) pipes (*McNeil v. Lane*).  The fact that lower courts have reached different

10  results in determining whether exposure to a given toxic substance is an unreasonably high level so

11  as to amount to an objectively sufficient serious condition highlights the difficulty that a reasonable

12  prison official would have in determining whether his conduct was unlawful when inmates are

13  exposed to or work with toxic substances.

14    Defendants Loredo and Earley are entitled to qualified immunity against Mr. Carter's claims

15  that they were deliberately indifferent based on the asbestos exposure because, as discussed above,

16  the facts in the record do not show the violation of a constitutional right by them.  *See Saucier*, 533

17  U.S. at 201 (defendants prevail on qualified immunity if there was no constitutional violation).  The

18  undefined contours as to what amounts to "unreasonably high levels," *Helling*, 509 U.S. at 35, of a

19  toxic substance (such as asbestos) to satisfy the objective prong of an Eighth Amendment analysis

20  also provide a second and independent basis for qualified immunity as to Mr. Carter's claims against

21  these two defendants.  That is, Mr. Earley and Mr. Loredo could have believed reasonably and

22  mistakenly that the risk was not sufficiently substantial to violate the Eighth Amendment when they

23  allowed him to clean a factory in a prison in which asbestos containing materials were generally

24  known to exist.

25    By contrast, Mr. Dobie is not entitled to qualified immunity with regard to the asbestos

26  because, viewing the evidence in the light most favorable to the nonmovant, Mr. Dobie was warned

27  by Mr. Beyett that power washing the pipes would damage the asbestos and nonetheless had the

28  inmates power wash the pipes for nearly two weeks.  In light of the *Wallis* decision's determination

that an Eighth Amendment violation occurred when the prisoner was required to directly handle and clean up damaged asbestos containing materials, a reasonable official in Mr. Dobie's position would not reasonably think it lawful to have inmates power wash old asbestos-wrapped pipes without wearing adequate protective gear.

All three defendants are entitled to qualified immunity against Mr. Carter's claims that they were deliberately indifferent based on the lead paint exposure because, as discussed earlier in this order, the facts in the record do not show the violation of a constitutional right. *See Saucier*, 533 U.S. at 201 (defendants prevail on qualified immunity if there was no constitutional violation). The undefined contours as to what amounts to "unreasonably high levels," *Helling*, 509 U.S. at 35, of a toxic substance such as lead to amount to satisfy the objective prong of an Eighth Amendment analysis also provide a second and independent basis for qualified immunity as to Mr. Carter's claims based on the lead exposure.  That is, Mr. Earley and Mr. Loredo would be entitled to qualified immunity because they could have believed reasonably and mistakenly that allowing inmates to clean a factory did not pose a sufficiently substantial risk to violate the Eighth Amendment, given their lack of knowledge that there was lead paint in the mattress factory and lack of knowledge that the inmates would be scraping lead paint.   Also, Mr. Dobie – who was warned of the presence of lead paint, according to Mr. Carter – would be entitled to qualified immunity because it would not have been clear to him when the risk posed by scraping lead paint became sufficiently serious to violate the Eighth Amendment.

       3.   <u>State Law Claims</u>

Mr. Carter contends that defendants Loredo and Earley "attempted to minimize the severity of the exposure by failing to disclose/enter onto the Workers' Compensation form exposure to asbestos." Docket # 1 at 4.  Mr. Carter does not dispute that he believed at the relevant time that he had been exposed to asbestos.  Mr. Carter also does not dispute that he did not attempt to file a second workers' compensation claim to add asbestos exposure to the list of alleged workplace injuries he suffered during the relevant time.

Defendants persuasively argue that any state law claims Mr. Carter is attempting to allege in his complaint must be dismissed.  First, the California's workers' compensation scheme in

California Labor Code sections 3370 and 3601 is the exclusive remedy for injuries arising out of the course and scope of employment.  *See* Cal. Lab. Code §§ 3600, 3602; *Cole v. Fair Oaks Fire Protection Dist.*, 43 Cal. 3d 148, 155-57 (Cal. 1987); *see also Jimeno v. Mobil Oil Corp*, 66 F.3d 1514, 1530 (9th Cir. 1995) ("we find that the California workers' compensation provisions provide the exclusive remedy under California law for a work-related physical disability discrimination claim").  The exclusive remedy provided by the California workers' compensation scheme also precludes an action against another employee except in two circumstances not alleged to be present here, i.e., intoxication or a "willful and unprovoked physical act of aggression of the other employee."  Cal. Lab. Code § 3601(a).

Second, insofar as Mr. Carter is alleging a claim of intentional concealment or fraud in the preparation of the worker's compensation claim form that might not fall within the exclusive remedy of the worker's compensation scheme, such a claim must be dismissed because Mr. Carter indisputably failed to comply with the California Government Claims Act, which requires presentation of the claim to the California Victim Compensation and Government Claims Board ("Board").  *See* Cal. Gov't Code §§ 905.2, 911.2, 945.4, 950.2.  Mr. Carter had to present his personal injury tort claim against a state employee or entity to the Board within six months of the accrual of the cause of action, and had to present any claim relating to any other cause of action within a year after the accrual of the cause of action.  *See* Cal. Gov't Code § 911.2.  Timely claim presentation is "a condition precedent to plaintiff's maintaining an action against [a state employee or entity] defendant."  *California v. Superior Court (Bodde)*, 32 Cal. 4th 1234, 1240 (Cal. 2004).  It is undisputed that Mr. Carter did not present a claim to the Board.  Therefore, any state law claim that is not barred by the rule that the workers' compensation scheme is the exclusive remedy is dismissed because Mr. Carter did not comply with the claim presentation requirement of the California Government Claims Act.  The state law claims are dismissed.

B.    Miscellaneous Matters

Mr. Carter's motion for leave to file a motion for reconsideration of the denial of his motion for a stay is DENIED.  Docket # 50.  To seek reconsideration of an interlocutory order, such as the order denying a motion for a stay, a party must obtain leave of court to file a motion for

United States District Court

For the Northern District of California

reconsideration, and show: (1) that at the time of the motion for leave to file a motion for reconsideration, a material difference in fact or law exists from that which was presented to the court before entry of the order for which the reconsideration is sought, and that in the exercise of reasonable diligence the party applying for reconsideration did not know such fact or law at the time of the order; or (2) the emergence of new material facts or a change of law occurring after the time of such order; or (3) a manifest failure by the court to consider material facts which were presented to the court before such interlocutory order. *See* N.D. Cal. Civil L.R. 7-9(b). Mr. Carter did not show any of those things.

Mr. Carter submitted some exhibits several months after he filed his opposition to the motion for summary judgment. *See* Docket # 53. (He labeled the document a "supplemental pleading," but it is supplemental evidence, rather than an amendment or supplement to his complaint.) Mr. Carter argued that defendants' late discovery response caused his lateness in filing those exhibits, but that argument fails to persuade the Court. The "lateness" in Mr. Carter receiving discovery responses is directly linked to Mr. Carter's lateness in propounding discovery requests. Mr. Carter waited until after defendants filed their motion for summary judgment in September 2014 before he bothered to send out any discovery requests, even though the Court had authorized the parties to commence discovery in its December 5, 2013 order of service. Moreover, several of the exhibits are not new, and Mr. Carter fails to reasonably explain why he did not submit them with his opposition brief. The June 7, 2012 memorandum from Jeremy Young was filed months ago by several of the other plaintiffs pursuing claims regarding the mattress factory cleaning, as were the incident report, the Spells declaration dated May 27, 2014, the N95 mask manufacturer's brochure, and the CALPIA Worksite Orientation pamphlet. Notwithstanding the unjustified delay in Mr. Carter's presentation of this evidence, in the interests of justice, the Court has considered the evidence in adjudicating the summary judgment motion. The Court was already aware of the late-filed evidence because of the Court's review of filings in the five other related cases. Defendants also likely were already aware of the evidence because it was filed in the other related cases.

C.      The Related Cases Will Be Sent For Settlement Proceedings

There are six related cases filed by six prisoners asserting claims based on their alleged exposure to asbestos and lead paint during the clean-up of the mattress factory in May - June 2012. *See Dewey Terry v. Smith*, C 13-4102 EMC; *Markee Carter v. Smith*, No. C 13-4373 EMC; *Evert Spells v. Smith*, No. C 13-4102 EMC; *Norman Hirscher v. Smith*, 14-340 EMC; *Richard Arnold v. Smith*, No. C 13-4456 EMC; and *Lynn Beyett v. Smith*, No. C 14-3153 EMC.  Defense summary judgment motions were filed in five of the cases, while service of process has not yet been accomplished in Case No. C 13-4456 EMC.  The six prisoner-plaintiffs appear to be coordinating their efforts, as their pleadings, requests, oppositions, and exhibits are similar.  In the five cases where defendants have been served, Defendants currently are being represented by the Law Office of Nancy E. Hudgins, except for Jeremy Young, who is now represented separately by attorney Kenneth Williams.

The ruling in this case (i.e., the *Carter* case) is not technically dispositive of the motions for summary judgments in each of the other related cases.  However, the ruling shows the Court's evaluation of the evidence and provides enough guidance for the parties in all the cases to have a good sense of their relative positions for settlement purposes.  It would be an unnecessary consumption of judicial resources for the Court to work through the hundreds of pages of evidence and arguments for the summary judgment motions in each of the other related cases when they all appear to raise similar arguments and present at least similar evidence.  The Court therefore has determined that the preferable way to proceed in the related actions is to dismiss the motions for summary judgment (other than the motion here in *Carter*, which the Court has adjudicated) and refer all the cases to a magistrate judge for settlement proceedings.

The Court strongly encourages the parties to consider resolving this case before trial and points out that the summary judgment briefing shows that both sides have issues with which to contend.  Because this was a summary judgment motion, the Court was required to view the evidence and inferences in the light most favorable to Mr. Carter as the nonmoving party.  There is no such requirement at trial.  At trial, the jury need not draw inferences in the light most favorable to the plaintiff.  At trial, the burden will be on the plaintiff to prove both the objective and subjective

United States District Court

For the Northern District of California

prongs of his Eighth Amendment claim.  Mr. Carter's case has weaknesses, and those weaknesses seem to be shared by all the plaintiffs in the related cases.  First, the alleged exposure to the asbestos was for a very short amount of time: perhaps as little as two days and inarguably not more than sixteen days.  Second, the evidence that the asbestos wrapping on the pipes was damaged does not appear to be undisputed, and there is no evidence that the asbestos-wrapped pipes posed any serious risk if the wrapping was not damaged.  Third, Mr. Carter seems to think that all the dust in the air was asbestos, but has not proven how he could discern the difference between cotton dust and airborne asbestos.  His chronology is questionable: he complains of exposure to asbestos from May 9 through June 6, but relies on a declaration indicating that the power-washer (which supposedly damaged the asbestos-wrapping and shook loose the asbestos) was not in use before May 23.  The documentary evidence suggests that Mr. Dobie may not have ordered the power-washing until June 4, just two days before the work was stopped.  Mr. Carter also has no proof that any of his current health complaints were caused by the substances to which he was exposed during the cleaning of the factory.  Fourth, a jury may well believe that Mr. Dobie was no more than negligent, and negligence will not satisfy the subjective prong of an Eighth Amendment claim.  The determination that Mr. Carter has raised a triable issue goes only to the existence of a claim and says nothing about its value – a value that appears to be quite modest due to the very limited exposure.

Of course, Defendants' case also has weaknesses.  A jury might find it not credible that Mr. Dobie did not at least suspect that there was asbestos wrapping on the pipe.  The Court notes that there is cooperative testimony from other witnesses presented in the other cases.  A jury could find deliberate indifference based on a workplace supervisor's refusal to heed a worker's caution that there were toxic substances in the workplace that would be disturbed by the cleaning and inappropriate power washing.

In light of the referral of these related cases for settlement proceedings, the Court now STAYS all discovery in this action.

///

///

///

<div style="writing-mode: vertical">**United States District Court**
For the Northern District of California</div>

## VI.    CONCLUSION

Defendants' motion for summary judgment is **GRANTED IN PART AND DENIED IN PART**.  (Docket # 33.) Specifically, the motion for summary judgment is granted in all respects except that it is denied as to the claim that Mr. Dobie was deliberately indifferent to a risk to Mr. Carter's health posed by asbestos and is denied on the qualified immunity defense for Mr. Dobie regarding the asbestos exposure.

Plaintiff's motion for leave to file a motion for reconsideration is **DENIED**.  (Docket # 50.)


IT IS SO ORDERED.


Dated: July 15, 2015

_____
EDWARD M. CHEN
United States District Judge